UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH D. EDMOND, | Case No. CV 15-8256-KK |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Kenneth D. Edmond ("Plaintiff") seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying his application for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income Benefits ("SSI"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the Commissioner's decision is REVERSED and this action is REMANDED for further proceedings consistent with this Order.

///

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill as Defendant in the instant case at Plaintiff's request.

# I.

## PROCEDURAL HISTORY

On September 14, 2012, Plaintiff filed applications for SSI and DIB alleging a disability onset date of December 6, 2011 for both. Administrative Record ("AR") at 166-73. Plaintiff's applications were denied initially on January 15, 2013, and upon reconsideration on May 14, 2013. Id. at 98-103, 105-11.

On June 11, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 112-13. On January 29, 2014, Plaintiff appeared with counsel and testified at a hearing before the assigned ALJ. Id. at 33-53. A vocational expert ("VE") also testified at the hearing. Id. at 49-52. On February 10, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Id. at 15-32.

On April 9, 2014, Plaintiff filed a request to the Agency's Appeals Council to review the ALJ's decision. Id. at 10-13. On August 26, 2015, the Appeals Council denied Plaintiff's request for review. Id. at 1-6.

On October 21, 2015, Plaintiff filed the instant action. ECF Docket No. ("Dkt.") 1, Compl. This matter is before the Court on the parties' Joint Stipulation ("JS"), filed on May 30, 2017, which the Court has taken under submission. Dkt. 31, JS.

# II.

## PLAINTIFF'S BACKGROUND

Plaintiff was born on January 17, 1961 and his alleged disability onset date is December 6, 2011. AR at 166, 168. He was forty-nine years old on the alleged disability onset date and fifty-two at the time of the hearing before the ALJ. Id. at 53, 166, 168. Plaintiff has completed two years of college and has prior work experience as an auditor. Id. at 193. Plaintiff alleges disability based on numbness in both arms and hand; stiffness in his neck and back; stomach pain and cramps; swelling and pain in both legs. Id. at 192.

///

# III.

## STANDARD FOR EVALUATING DISABILITY

To qualify for DIB and SSI, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity, and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

1. Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

2. Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

3. Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.[2]

4. Is the claimant capable of performing work he has done in the past?  If so, the claimant is found not disabled.  If not, proceed to step five.

5. Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

---

[2] "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]," or ability to work after accounting for her verifiable impairments.  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

See Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## IV.

## THE ALJ'S DECISION

### A.    STEP ONE

At step one, the ALJ found Plaintiff "engaged in substantial gainful activity during the following periods: December 2011 through March 2012 . . . However, there has been a continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity. The remaining findings address the period(s) [Plaintiff] did not engage in substantial gainful activity . . . from April 1, 2012, through the date of this decision." AR at 20-21.

### B.    STEP TWO

At step two, the ALJ found Plaintiff "ha[d] the following severe impairments: degenerative joint disease and degenerative disc disease of the cervical spine; status-post cervical fusion in June 2013; cervical radiculopathy; hypertension; lumbago; degenerative narrowing at the lateral joint compartment of the left knee; and mild osteopenia in the right knee." Id. at 21.

///

**C. STEP THREE**

At step three, the ALJ found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Id.

**D. RFC DETERMINATION**

The ALJ found Plaintiff had the following RFC:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.97(b) except [Plaintiff] can lift and/or carry 20 pounds occasionally and 10 pounds frequently: he can stand and/or walk for six hours out of an eight-hour workday but no more than 15-20 minutes at a time; he can sit for six hours out of an eight-hour workday but with brief position changes after 1-2 hours; he can occasionally perform postural activities; he cannot climb ladders, ropes, or scaffolds; he cannot work at unprotected heights, around moving machinery, or other hazards; he cannot do overhead reaching or lifting bilaterally; he cannot do repetitive or constant pushing and/or pulling with the lower extremities, such as operating foot pedals; he cannot do repetitive or constant fine manipulation bilaterally, but frequent use is permissible; he cannot perform jobs that require fast paced production or assembly line type work; and he needs ready access to a restroom, meaning it needs to be in the same building.

Id. at 22.

**E. STEP FOUR**

At step four, the ALJ found Plaintiff "is capable of performing past relevant work as an auditor." Id. at 28. The ALJ, therefore, found Plaintiff not disabled and did not proceed to step five. Id.

///

///

5

# V.

## PLAINTIFF'S CLAIMS

Plaintiff presents one disputed issue: whether the ALJ failed to articulate specific and legitimate reasons for rejecting Plaintiff's testimony as not credible. JS at 5.

# VI.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).

"Substantial evidence" is evidence that a reasonable person might accept as adequate to support a conclusion. Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Id. To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick, 157 F.3d at 720 (citation omitted); see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating that a reviewing court "may not affirm simply by isolating a 'specific quantum of supporting evidence'") (citation omitted). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Reddick, 157 F.3d at 720-21; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

The Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007). If the ALJ erred, the error may only be considered harmless if it is "clear from the record" that the error was "inconsequential to the ultimate nondisability determination." <u>Robbins</u>, 466 F.3d at 885 (citation omitted).

## VII.

## RELEVANT FACTS

### A.    Plaintiff's Testimony

Plaintiff testified he has "consistent pain in [his] neck" and that the daily level of pain ranges from a nine or a ten without medication, and an eight or a nine with medication. AR at 39-40. Plaintiff additionally testified he suffers from "nerve damage in [his] hands which results [in] them always being cold and numb." <u>Id.</u> at 39. Plaintiff claims that because of the nerve damage, he has difficulty lifting his arms above his head. <u>Id.</u> at 40. In addition to the nerve damage and neck pain, Plaintiff testified he suffers from arthritis in both of his knees, which limits the length of time he is able to sit or stand. <u>Id.</u> at 42. Plaintiff testified he often loses his balance while walking, and occasionally uses an assistive device for balance. <u>Id.</u> at 43.

To manage the pain, Plaintiff testified he is currently taking muscle relaxers, blood pressure medication, and prescription Ibuprofen. <u>Id.</u> at 40-41. Depending on the pain, Plaintiff will take three or four 800-miligram Ibuprofen pills per day. <u>Id.</u> at 41. Plaintiff testified he received surgery on his neck, which only slightly improved the pain. <u>Id.</u> at 39. He did not go through physical therapy following his surgery. <u>Id.</u> at 41.

Because of the pain, Plaintiff testified he spends about half the day lying down. <u>Id.</u> at 48. He often takes two to three naps a day for a total of about two to three hours. <u>Id.</u> at 49. He has difficulties engaging in simple daily tasks like getting

7

dressed and putting shoes on.  Id.  As of the date of the hearing, Plaintiff stated he had not had any recent visits to the hospital or emergency room because of his pain. Id. at 40.

**B.     The ALJ's Adverse Credibility Determination**

In evaluating Plaintiff's allegations of pain, the ALJ found Plaintiff's claims were "less than fully credible."  Id. at 23.  First, the ALJ questioned Plaintiff's descriptions of his limited daily activities, which generally involved hours spent immobile and in bed, finding it difficult to reconcile Plaintiff's severe limitations with the "relatively benign medical evidence . . . ."  Id.  As to Plaintiff's allegations of difficulty sleeping through the night, the ALJ noted, "Perhaps his poor sleep is caused by his diurnal sleeping pattern, allegedly consisting of 2-3 naps daily, each 2 to 3 hours in duration, coupled with lying down for up to 12 hours per day."  Id.

Additionally, the ALJ considered Plaintiff's receipt of unemployment benefits from 2012 to 2013 as a factor affecting the credibility and weight of the evidence.  Id. at 24.  The ALJ noted Plaintiff's earning records reveal Plaintiff "received unemployment benefits from the second quarter of 2012 through the second quarter of 2013."  Id.  The ALJ highlighted the fact that "[i]n order to receive unemployment benefits, [Plaintiff] was required to certify he was willing and able to engage in work activity, which is inconsistent with a claim for disability."  Id.

Furthermore, the ALJ noted Plaintiff "has not received the type of treatment one would expect from a completely disabled individual, as evidenced by gaps in the claimant's history of treatment and generally conservative treatment."  Id. at 24.  The ALJ specifically found the "treatment records reveal [Plaintiff] received routine, conservative, and non-emergency treatment since the alleged onset date." Id.  While conceding Plaintiff underwent surgery on his cervical spine, the ALJ noted "the medical record indicates that this greatly improved his condition."  Id. Specifically, the ALJ noted "[i]t appears [Plaintiff's] symptoms were greatly

relieved after surgery, as there are no medical recording showing that he attended physical therapy or presented for treatment of this condition again for nearly a year." Id. at 25.

Moreover, the ALJ stated "the medical records show that [Plaintiff] failed to follow up on several referrals to specialist[s], indicating that his symptoms are not as severe as alleged . . . [and] demonstrate[ing] a possible unwillingness to do what is necessary to improve his symptoms." Id. at 26. For example, the ALJ noted "the medical records indicate that [Plaintiff] did not follow up on [a referral he received on February 24, 2012]." Id. at 25; see also id. at 693. Additionally, the ALJ noted in August 2013, Plaintiff was referred to a neurologist for evaluation, but "[i]t is unclear if [Plaintiff] followed up on this referral." Id. at 26.

Ultimately, the ALJ concluded that after reviewing and considering Plaintiff's complete medical history, "[t]he treatment records reveal [Plaintiff] received routine, conservative, and non-emergency treatment since the alleged onset date" and "[t]he positive objective clinical and diagnostic findings since the alleged onset date detailed below do not support more restrictive functional limitations than those assessed herein." Id.

## VIII.

## DISCUSSION

**THE ALJ FAILED TO CONSIDER THE OVERALL DIAGNOSTIC RECORD WHEN REJECTING PLAINTIFF'S TESTIMONY**

**A.    PLAINTIFF'S RELEVANT MEDICAL HISTORY**

**1.    Plaintiff's Symptoms and Treatment Before Surgery**

On December 6, 2011, Plaintiff visited Kaiser Permanente's Department of Emergency Medicine with complaints of pain on the left side of his neck and shoulder. AR at 408-13. Plaintiff was prescribed Norco and Robaxin, to take as needed, and instructed to follow up with his primary treating physician. Id.

On December 12, 2011, Plaintiff was examined by his treating physician, Dr. Kenneth Van Williams ("Dr. Kenneth Williams"), a family medicine doctor of osteopathy. <u>Id.</u> at 425-26. Dr. Kenneth Williams noted Plaintiff claimed to be suffering from moderately severe left shoulder pain, which had persisted for more than two weeks. <u>Id.</u> at 426. Additionally, Dr. Kenneth Williams noted Plaintiff's pain is "aggravated by abduction and rotation, and overhead motions," and not relieved by Plaintiff's current medication. <u>Id.</u> Dr. Kenneth Williams diagnosed Plaintiff with "bursitis of shoulder region," specifically "rotator cuff tendinitis." <u>Id.</u> at 428. Dr. Kenneth Williams ordered an x-ray, referred Plaintiff to physical therapy, and prescribed Naproxen and Norco to manage the pain. <u>Id.</u> X-rays revealed normal alignment, no acute fractures, no significant soft tissue abnormality, but a mild degenerative change of the acromioclavicular joint. <u>Id.</u> at 437.

On December 20, 2011, Plaintiff returned to Dr. Kenneth Williams because the pain in his neck and shoulder continued to worsen despite the prior week's treatment. <u>Id.</u> at 449. Dr. Kenneth Williams noted that, in addition to pain, Plaintiff now complained of a numbing sensation radiating down into his left arm and hand. <u>Id.</u> According to Plaintiff, the pain in his shoulder worsened when he lifted his arm. <u>Id.</u> Dr. Kenneth Williams diagnosed Plaintiff with cervical radiculopathy and treated him with a steroid cortisone shot. <u>Id.</u> at 451.

On December 27, 2011, Plaintiff returned to Dr. Kenneth Williams complaining of "left arm pain, numbness, and weakness, feels cold." <u>Id.</u> at 459. Dr. Kenneth Williams noted Plaintiff received a cortisone injection in his left shoulder the week before, but relief lasted for less than 24 hours. <u>Id.</u> Dr. Kenneth Williams ordered additional x-rays, prescribed Prednisone, and referred Plaintiff to an orthopedist. <u>Id.</u> at 460.

On January 4, 2012, Plaintiff was examined by Dr. Shane K. Williams, an orthopedic surgeon ("Dr. Shane Williams"). <u>Id.</u> at 478. Following an initial

observation, Dr. Shane Williams ordered an MRI of Plaintiff's left shoulder. Id. at 480.

On January 6, 2012, Plaintiff began his first session of physical therapy. Id. at 487-88. The physical therapist noted Plaintiff suffered from the following functional limitations / aggravating factors: coughing, driving, looking over shoulder, lying on left side, bathing, dressing and grooming activities, reaching overhead, lifting objects with work activities. Id. at 489. The physical therapist also noted Plaintiff's current level of pain was a 3 out of 10 at rest, and a 10 out of 10 with activity. Id. The physical therapist additionally noted Plaintiff's symptoms as "insidious onset aching, constant, sharp, and radiating numbness, tingling and 'cold' sensation in left upper extremity to hand." Id. at 490. Plaintiff was scheduled to have eight sessions of physical therapy over the course of eight weeks. Id. at 488. The goals for Plaintiff, as established by the physical therapist, were to: be compliant with home exercise program within four weeks, improve posture with daily and work activities within six weeks, be able to manage radicular symptoms with posture and exercise within eight weeks, improve left grip strength to 90% of right within eight weeks to perform lifting activities at work, and be able to perform dressing, bathing and grooming activities without limitation within eight weeks. Id.

On January 7, 2012, Plaintiff received his x-rays ordered by Dr. Kenneth Williams on December 27, 2011. Id. at 461. The x-rays revealed "[m]ild degree of degenerative joint disease . . . with spurring at multiple vertebrae and presence of narrowing of some intervertebral spaces." Id.

On January 12, 2012, Plaintiff received the results from his MRI ordered by Dr. Shane Williams on January 4, 2012. Id. at 482. According to the radiologist's report, the MRI revealed abnormal findings, including "hypetrophic degenerative changes of the acromioclavicular joint with lateral downsloping of the acromion process with undersurface spurring"; "mild increased intrasubstance signal along the superior fibers of the underlying supraspinatus tendon"; "a small rim rent tear

of the supraspinatus tendon at the footplate"; "prominent subcortical cystic changes at the greater tuberosity." Id.

On January 13, 2012, Plaintiff completed his second session of physical therapy. Id. at 524. The physical therapist noted Plaintiff reported "no change in neck and shoulder pain," "difficulty using left hand for writing," and a four out of ten pain level. Id.

On January 19, 2012, Dr. Shane Williams reviewed Plaintiff's January 12, 2012 MRI results, including the radiologist's report, and determined that there was "no evidence of full-thickness rotator cuff tear, but supraspinatus tendinopathy." Id. at 574. Dr. Shane Williams treated Plaintiff with a Depo-Medrol injection into the left shoulder and advised Plaintiff to continue to take his prescription pain-relievers and to attend physical therapy. Id. at 575.

On January 24, 2012, Plaintiff returned to Dr. Kenneth Williams, "complaining of left shoulder pain with radiation of numbness sensation down into right arm" and claiming his "whole left arm seems weaker and numb." Id. at 585. Dr. Kenneth Williams encouraged Plaintiff to continue physical therapy and taking medications as directed. Id. at 587.

On February 3, 2012, Plaintiff completed his third session of physical therapy. Id. at 601. The physical therapist noted Plaintiff reported "no significant relief at this time, numbness in left hand/fingers continues," and a continuous pain level. Id.

On February 8, 2012, Plaintiff returned to Dr. Kenneth Williams complaining of numbness in his left arm and hand, as well as constipation. Id. at 607. Plaintiff requested an "intra-articular injection to left shoulder." Id. at 608. Dr. Kenneth Williams noted he declined to fulfill Plaintiff's request and instead directed him to Orthopedics. Id. He further noted Plaintiff appeared "noticeably disappointed." Id. According to Dr. Kenneth Williams, Plaintiff had missed two of his physical therapy appointments. Id. at 607.

On February 14, 2012, Plaintiff completed his fourth session of physical therapy. Id. at 616. The physical therapist noted Plaintiff reported "continued and persistent numbness and tingling in bilateral hands and weakness in left shoulder." Id. According to Plaintiff, the pain level in his neck was at a four to five out of ten. Id.

On February 23, 2012, Plaintiff completed his fifth session of physical therapy. Id. at 683. The physical therapist noted Plaintiff reported "continued and persistent numbness and tingling in bilateral hands and weakness in left shoulder"; "his greatest concern is the numbness and tingling in hands"; and "he is having difficulty with dressing (buttons) and tying his shoes." Id. According to the physical therapist's assessment, Plaintiff "notes relief of neck pain during treatment, but no change in upper extremity symptoms. No change in overall neck and shoulder range of motion actively." Id. The physical therapist also noted Plaintiff presented with "[d]ecreased grip strength bilateral upper extremities . . . compared to initial evaluation with [Plaintiff] demonstrating good effort during testing," and that he "requir[es] verbal cueing with posture and he is attempting to be more aware." Id. Lastly, the physical therapist noted Plaintiff is "not responding to conservative treatments," but recommended Plaintiff continue physical therapy. Id. at 683, 686.

On February 27, 2012, Dr. Shane Williams saw Plaintiff for a follow-up evaluation of Plaintiff's left shoulder. Id. at 719-20. Dr. Shane Williams noted Plaintiff has been suffering from "moderate aching pain in his left shoulder" for the last four months and specifically "has pain with overhead use of his left arm." Id. at 720. Dr. Shane Williams observed Plaintiff has seen "small signs of improvement" through physical therapy and "only mild improvement in his symptoms" from the last cortisone injection he received. Id. Dr. Shane Williams ordered a nerve conduction study "to evaluate diffuse bilateral upper extremity paresthesias." Id. at 721.

On March 5, 2012, Dr. Ambika Bhat, a doctor of Physical Medicine and Rehabilitation, performed a nerve conduction study on Plaintiff. Id. at 735. During the appointment, Dr. Bhat noted Plaintiff has a history of "peripheral edema," and presents with "complaints of entire [left] arm numbness and [right] hand numbness" for over a month, as well as "feelings of coldness in [left] hand." Id. Additionally, Dr. Bhat noted Plaintiff reported "[bilateral] hand weakness/loss of control with fine motor activities such as putting on shoes . . . [and] weakness with lifting." Id. Lastly, Dr. Bhat noted Plaintiff "[o]riginally had pain in neck and left shoulder which has improved." Id. Following the study, Dr. Bhat found Plaintiff presented with "findings of sensorimotor polyneuropathy," and had "[a]bnormal electrodiagnostic" results. Id. at 737. Thus, Dr. Bhat referred Plaintiff to a neurologist "for abnormal findings on [the nerve conduction study] not consistent with cervical radiculitis or carpal tunnel syndrome," and noting Plaintiff had "[left] finger abduction weakness, normal reflexes, impaired tandem gait." Id. at 738.

On March 6, 2012, Plaintiff completed his sixth session of physical therapy. Id. at 743-44, 749-52. The physical therapist noted Plaintiff rated his neck pain at a five out of ten and reported "continued and persistent numbness and tingling in bilateral hands and weakness in left shoulder." Id. at 750. Plaintiff stated he "continue[d] to have difficulty with dressing (buttons) and tying his shoes." Id. The physical therapist noted Plaintiff reports "relief of neck pain during treatment but no change in upper extremity symptoms," and "[n]o change in overall neck and shoulder range of motion actively." Id. at 745. The physical therapist concluded Plaintiff "has not responded to conservative treatment at this time," and thus, discharged Plaintiff to an independent home exercise program. Id. at 745, 751.

On March 26, 2012, Plaintiff had a consultation with Dr. Sameh Samir Labib, a neurologist, based on Dr. Bhat's referral regarding the results of Plaintiff's nerve conduction study. Id. at 762. Dr. Labib noted that, beginning in December

14

2011, Plaintiff suffered from pain in his shoulder caused by shoulder bursitis. Id. at 763. Although Plaintiff was prescribed medication and underwent physical therapy, there was little improvement. Id. In addition to the shoulder pain, Dr. Labib noted Plaintiff had recently started feeling numbness in his left hand, which got progressively worse, before developing in his right hand as well. Id. Dr. Labib additionally noted Plaintiff's hand numbness has continued to get worse. Id. He noted Plaintiff's numbness prevents him from feeling his hands even when he puts them into his pockets, hinders his ability to button his shirt, and causes his "hands [to] get extremely cold." Id. After examining Plaintiff, Dr. Labib concluded "Easy giveway/poor effort L shoulder"; "inconsistent effort of hand muscles, mostly in L hand . . . but doubt true weakness." Id. at 764. After reviewing the abnormal results from Plaintiff's nerve conduction study, Dr. Labib concluded Plaintiff's "presentation is atypical." Id. at 767. Dr. Labib found "[r]eported progression is too rapid for polyneuropathy"; "[e]xam is not highly suggestive of such 'aggressive' polyneuropathy"; and Plaintiff "has no other obvious risk factors for polyneuropathy." Id. Dr. Labib ordered an MRI of Plaintiff's cervical spine and a repeat nerve conduction study. Id.

On April 10, 2012, Plaintiff had the MRI ordered by Dr. Labib, which revealed "multilevel degenerative stenosis, most significant at C3-4 and C4-5." Id. at 768. As a result, Dr. Labib referred Plaintiff to Dr. Vikas Mehta, a neurologist, noting Plaintiff's "[c]ervical MRI show[ed] severe spinal stenosis at C3-4 and C4-5 with cord compression and myelomalcia." Id. at 225, 226.

On April 27, 2012, following the referral from Dr. Labib, Dr. Mehta met with Plaintiff. Id. at 227. Dr. Mehta noted Plaintiff complained of: balance difficulties while walking, dropping objects from hand, difficulty handwriting, buttoning clothing, difficulty opening jars, hand clumsiness, hand numbness, and hand weakness. Id. Dr. Mehta observed Plaintiff "has normal reflexes and intact cranial nerves," but he "displays weakness," presents with a "sensory deficit," "has an

abnormal Tandem Gait Test," and has "[n]umbness to LT grossly [in] bilateral hands and fingers." Id. at 229. Dr. Mehta further noted Plaintiff has "hand weakness, numbness[,] and clumsiness consistent with cervical myelopathy and T2 signal change in spinal cord most likely secondary to cervical stenosis impinging upon the spinal cord." Id.

Dr. Mehta advised Plaintiff that his "cervical degenerative disease may progress and cause more spinal cord compression and resultant neurological deficits and progression of symptoms." Id. Dr. Mehta suggested surgery as a treatment option, but cautioned that "surgery would not necessarily help with [Plaintiff's] pain in the back of the head, neck, shoulder, arm, and chest and may even make his pain worse or his neck range of motion worse and he would need to wear a cervical collar for a few months after surgery." Id.

On June 4, 2012, Plaintiff underwent cervical laminoplasty surgery for cervical stenosis with myelopathy. Id. at 332. Following the surgery, Plaintiff was prescribed medications including Valium, Norco, and Robaxin to manage the pain. Id. at 334.

### 2. Plaintiff's Symptoms and Treatment After Surgery

On June 15, 2012, Dr. Mehta saw Plaintiff for a follow-up appointment. Id. at 300-01. Dr. Mehta noted Plaintiff was "doing very well post-op" and was "very satisfied with the surgical outcome." Id. at 301. Dr. Mehta further noted Plaintiff stated his "right hand symptoms are improved after surgery." Id. at 300. Dr. Mehta advised against physical therapy at that time. Id. at 811. Dr. Mehta referred Plaintiff to Dr. Matthew Thomas Huey to "evaluate and treat for rehab and residual symptoms." Id.

On July 5, 2012, Plaintiff visited Dr. Huey. Id. Dr. Huey noted Plaintiff complained of neck pain and numbness and tingling of the finger tips. Id. Dr. Huey noted Plaintiff had been on unemployment since March 2012 and advised Plaintiff remain off work until August 15, 2012. Id. at 814. Dr. Huey further

advised Plaintiff to return for a follow up in five weeks, around August 9, 2012.  Id.
Dr. Huey advised against physical therapy at that time.  Id.

On August 9, 2012, Plaintiff returned to see Dr. Mehta.  Id. at 309.  Plaintiff
complained of "abdominal pain and discomfort and back and leg pain."  Id.  Dr.
Mehta advised Plaintiff to follow up with his primary care physician and also
ordered cervical x-rays as part of his routine follow up.  Id.  The x-rays revealed
"[m]oderate to severe degenerative disk disease . . . from C3-C4 through C6-C7,
as before."  Id. at 823.  Plaintiff was still taking Valium, Norco, and Robaxin to
manage his pain at this time.  Id. at 311.

In September 2012, Plaintiff lost his Kaiser health insurance.  Id. at 884.
The record does not indicate whether Plaintiff was able to obtain any other health
insurance.

On December 17, 2012, Plaintiff saw Dr. Vicente R. Bernabe, an orthopedic
surgeon, for an orthopedic consultation.  Id. at 356-61.  Dr. Bernabe diagnosed
Plaintiff with "status post posterior cervical fusion per history from C3 to C7,"
cervical radiculopathy, degenerative disc disease of the cervical spine, and cervical
musculoligamentous strain.  Id. at 360.  However, Dr. Bernabe noted Plaintiff's
range of motion in the upper and lower extremities was within normal limits.  Id. at
359.

On August 29, 2013, Plaintiff visited Wesley Health Centers complaining of
pain in neck and both knees, as well as numbness and tingling in both legs and
hands.  Id. at 884.  According to notes from the visit, Plaintiff's cervical surgery
originally eased his symptoms; but about six to seven months later, he began to
have a stiff neck and bilateral knee pain.  Id.  Plaintiff was advised to return to
urgent care if the pain became intolerable.  Id.

On August 30, 2013, Plaintiff had x-rays taken of his knees and spine.  Id. at
895-98.  The x-rays of his knees revealed mild osteopenia in both knees and
degenerative narrowing of the lateral joint compartment in the left knee.  Id. at 895-

96. The x-ray of his spine revealed "multilevel degenerative spurring of vertebral endplates C4 through T1"; "degenerative disc disease C4 through T1"; "multilevel left lateral fusion from C3 through C6." Id. at 897.

On September 5, 2013, Plaintiff underwent a disability assessment by a physician with the Department of Public Social Services. Id. at 890. Plaintiff was found temporarily disabled from September 5, 2013 to November 11, 2013 due to neck and knee pain. Id.

On November 22, 2013, Plaintiff underwent a second disability assessment by a physician with the Department of Public Social Services. Id. at 887. Plaintiff was found temporarily disabled from November 22, 2013 to January 30, 2014 as a result of his neck problems. Id. at 888.

On January 23, 2014, Plaintiff underwent a third disability assessment. Id. at 926-31. As a result of his neck pain, Plaintiff was found temporarily disabled until February 22, 2014. Id.

On February 14, 2014, Plaintiff underwent a fourth disability assessment. Id. at 936-41. Due to Plaintiff's knee pain and hand numbness, Plaintiff was found temporarily disabled until August 14, 2014. Id.

## B. APPLICABLE LAW

If "the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." Robbins, 466 F.3d at 883 (citations omitted). The ALJ's credibility determination must be supported by "findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation and internal quotation marks omitted).

The ALJ is required to engage in a two-step analysis. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment

which could reasonably be expected to produce the pain or other symptoms alleged." Molina, 674 F.3d at 1112 (citations and internal quotation marks omitted). "If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." Id. (citations and internal quotation marks omitted). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see also Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th Cir. 2015) (holding "an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination").

"If the ALJ's credibility finding is supported by substantial evidence, [a court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). However, an ALJ's failure to give specific, clear, and convincing reasons to reject the claimant's testimony regarding the severity of the symptoms is not harmless, because it precludes the Court from conducting a meaningful review of the ALJ's reasoning. Brown-Hunter, 806 F.3d at 489.

## C. ANALYSIS

Here, the ALJ failed to consider the overall diagnostic record when he erroneously relied upon (1) Plaintiff's purported conservative treatment; (2) instances of temporary improvement in Plaintiff's symptoms; and (3) Plaintiff's purported exaggeration of his symptoms and receipt of unemployment benefits, in determining Plaintiff's claims were less than fully credible. See Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2013) (holding an ALJ must view a claimant's treatment records "in light of the overall diagnostic record" to determine whether certain factors undermine Plaintiff's testimony).

### 1.  The ALJ Erroneously Relied on Plaintiff's Purportedly Conservative Treatment

In coming to his adverse credibility determination, the ALJ found Plaintiff "has not received the type of treatment one would expect from a completely disabled individual" as evidenced by Plaintiff's (1) gaps in history of treatment, (2) failure to follow up on referrals for specialists, and (3) routine, non-emergency treatment. AR at 24, 25. The ALJ erred, however, by failing to consider the overall diagnostic record.

First, in relying on Plaintiff's "gaps in history of treatment," the ALJ failed to address the fact that Plaintiff consistently and regularly saw doctors from December 2011 to August 2012 – oftentimes more than once in a single month – and August 2013 to February 2014. While there is a gap in Plaintiff's treatment history from August 2012 to August 2013, the medical records establish Plaintiff lost his health insurance in September 2012 and do not indicate Plaintiff ever obtained health insurance following this loss. See id. at 884. Plaintiff's "failure to seek treatment during the period that he had no medical insurance cannot support an adverse credibility finding." Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007); Gamble v. Chater, 68 F.3d 319, 321 (9th Cir. 1995); see also Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (holding "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding unless one of a "number of good reasons for not doing so" applies). Looking at the "overall diagnostic record," it appears Plaintiff regularly and consistently sought treatment when he had medical insurance. Thus, relying on the gap in medical treatment, during a time where Plaintiff did not have medical insurance, ignores the overwhelming evidence establishing regular treatment and does not support an adverse credibility finding. See Ghanim, 763 F.3d at 1164.

Second, the ALJ's reliance on the conclusion that Plaintiff failed to follow up on referrals to specialists is erroneous because this conclusion is not supported by

the overall diagnostic record.  AR at 25-26.  The ALJ cited two instances in which Plaintiff appeared not to have followed up on his doctors' referrals: (1) a referral to an orthopedic specialist on February 24, 2012; and (2) a referral to a neurologist in August 2013.  Id.  As to Plaintiff's February 24, 2012 visit, although it appeared Dr. Kenneth Williams placed an orthopedic referral for Plaintiff's knee, it is unclear whether Dr. Kenneth Williams actually ordered the referral as there is nothing under "Patient Instructions" directing Plaintiff to make an appointment with an orthopedist.  Id. at 693-94; see id. at 695-701.  As to Plaintiff's August 2013 neurologist referral, the ALJ himself notes it is unclear if Plaintiff followed up on this referral.  See id. at 26.  To the extent the ALJ found the record ambiguous, the ALJ had a duty to conduct an appropriate inquiry.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry." (citing Smolen, 80 F.3d at 1288).

Additionally, even assuming Plaintiff failed to follow up on these two referrals, looking at the "overall diagnostic record," it appears Plaintiff regularly followed up on his doctors' referrals.  For example, on January 24, 2012, Plaintiff saw orthopedist Dr. Shane Williams, as a result of his primary care physician's referral; on March 5, 2012, Plaintiff saw Dr. Bhat as a result of Dr. Shane William's order to obtain a nerve conduction study; on March 26, 2012, Plaintiff saw Dr. Labib as a result of Dr. Bhat's referral to see a neurologist; and on July 5, 2012, Plaintiff saw Dr. Huey as a result of Dr. Mehta's referral for a rehab specialist.  AR at 478, 735, 762, 811.  Thus, the ALJ's (1) reliance on Plaintiff's two alleged failures to follow up on referrals as grounds for his adverse credibility determination, and (2) failure to consider the other referrals upon which Plaintiff did follow up, was erroneous.  See Ghanim, 763 F.3d at 1164.

Third, the ALJ's reliance on the finding that Plaintiff received routine, non-emergency treatment only is erroneous because the overall diagnostic record does not support such a finding.  AR at 25.  As a preliminary matter, Plaintiff's neck and back pain was severe enough to warrant invasive surgery by Plaintiff's neurologist, Dr. Mehta, on June 4, 2012.  Id. at 332.  Moreover, although Plaintiff showed improvement following surgery, his symptoms returned causing him to pursue treatment in July and August 2012 - prior to losing his health insurance - and later again in August 2013.  See id. at 309, 811, 884.  While there may not be any evidence of *emergency* treatment related to Plaintiff's knee, neck, and back pain, there is evidence of Plaintiff's consistent and repeated efforts to seek out treatment for symptoms that evidently continued to affect him.  Notably, the medical record indicates Plaintiff was not responding to conservative treatment.  See id. at 684, 686, 745, 751.  Ultimately, nothing in the medical record suggests Plaintiff ever received treatment that sufficiently addressed his symptoms, or that other treatment options were available for Plaintiff to pursue.  Lapeirre-Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010)[3] ("A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist.").

Accordingly, reliance on Plaintiff's purportedly conservative treatment based on alleged gaps in Plaintiff's treatment history, failure to follow up on referrals for specialists, and overall non-emergency treatment fails to constitute specific, clear, and convincing reasons to reject Plaintiff's testimony.  See Brown-Hunter, 806 F.3d at 489.

///

///

///

---

[3] The Court may cite to unpublished Ninth Circuit opinions issued on or after January 1, 2007.  U.S. Ct. App. 9th Cir. R. 36-3(b); Fed. R. App. P. 32.1(a).

### 2. The ALJ Erroneously Relied on Temporary Improvements in Plaintiff's Symptoms

The ALJ also cited instances of temporary improvement in Plaintiff's symptoms in coming to his adverse credibility determination. The ALJ found Plaintiff underwent cervical spine surgery, which "greatly improved [Plaintiff's] condition" and relieved many of his symptoms. AR at 24-25. Specifically, the ALJ noted Plaintiff did not attend physical therapy following his surgery, nor did he "present[] for treatment of this condition again for a year." Id. at 25.

In concluding that the surgery greatly improved Plaintiff's condition, the ALJ failed to address the fact that many of Plaintiff's symptoms associated with his cervical spine condition returned shortly after the surgery. For example, on July 5, 2012, just one month after Plaintiff's surgery, Plaintiff visited Dr. Huey complaining of neck pain and numbness and tingling of the finger tips. Id. at 811. Additionally, on August 9, 2012, Plaintiff visited Dr. Mehta complaining of back and leg pain. Id. at 309. X-rays ordered by Dr. Mehta at that time revealed Plaintiff suffered from "[m]oderate to severe degenerative disk disease . . . from C3-C4 through C6-C7, as before." Id. at 823. Furthermore, on August 29, 2013, Plaintiff visited Wesley Health Centers complaining of pain in the neck and knees and numbness and tingling in both his legs and hands. Id. at 884. A note from the physician indicated that while the surgery originally eased Plaintiff's symptoms, they eventually began to return months after the surgery. Id. Notably, the return of Plaintiff's pain is consistent with the warning given by Dr. Mehta, who, prior to conducting Plaintiff's surgery cautioned Plaintiff that "surgery would not necessarily help with [Plaintiff's] pain in the back of the head, neck, shoulder, arm, and chest and may even make his pain worse or his neck range of motion worse." Id. at 229.

Moreover, while Dr. Mehta and Dr. Huey noted physical therapy as an option for part of Plaintiff's treatment plan following surgery, they both stated

23

Plaintiff should not begin physical therapy until two to three months after surgery. See id. at 811, 814. Despite these notes, however, the record does not show either doctor ever prescribed Plaintiff a course of physical therapy[4]. While the Court realizes this could have been due to the fact that Plaintiff lost his health insurance and thus was unable to return to see either doctor, the record does not contain any explanation, nor did the ALJ inquire into this possibility. See Tonapetyan, 242 F.3d at 1150. Thus, the ALJ's conclusion, absent further investigation, that Plaintiff "fail[ed] to undergo physical therapy that could have improved the alleged pain" following his surgery as part of the reason for questioning Plaintiff's credibility was erroneous.

Lastly, from November 11, 2013 to August 14, 2014, Plaintiff was found "temporarily disabled" due to his neck and back pain according to the findings of four disability assessments conducted by the Department of Public Social Services. Id. at 890-941. While the ALJ ultimately gave little weight to these opinions - finding them "brief, conclusory, and inadequately supported by clinical findings" - the assessments, at a minimum, show that Plaintiff's improvements following his surgery were only temporary. Id. at 27.

Thus, the ALJ's reliance on Plaintiff's reported improvement in his symptoms immediately following his surgery, without considering evidence that Plaintiff's pain symptoms returned, erroneously fails to consider the diagnostic record as a whole. See Ghanim, 763 F.3d at 1164.

---

[4] Additionally, to the extent the ALJ believed Plaintiff chose to discontinue the physical therapy he was engaged in prior to surgery, this belief is not supported by the evidence. See AR at 25 ("[T]he claimant decided to discontinue physical therapy after only a few visits."). While Plaintiff missed two physical therapy sessions, it appears from the record he was ultimately discharged by the therapist because Plaintiff had "not responded to conservative treatment" and, therefore, was being discharged to an independent home exercise program. Id. at 745, 751.

### 3. The ALJ Erroneously Relied on Plaintiff's Purported Exaggeration of His Symptoms and Receipt of Unemployment Benefits to Evaluate Plaintiff's Credibility

Finally, the ALJ improperly based his credibility determination on Plaintiff's (1) description of his daily activities; and (2) receipt of unemployment benefits.[5]

As to Plaintiff's daily activities, the ALJ questioned Plaintiff's claims that his days were limited to hours spent immobile and in bed, finding it difficult to reconcile Plaintiff's severe limitations with the "relatively benign medical evidence . . . ." AR at 23. However, claims of immobility and fatigue are not necessarily inconsistent with symptoms caused by back, neck, and knee problems, as well as daily consumption of prescription painkillers. More importantly, focusing on Plaintiff's allegedly exaggerated claims of immobility in assessing his credibility

---

[5] On March 28, 2016, after the ALJ's assessment in this case, SSR 16–3p went into effect. See SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16–3p supersedes SSR 96–7p, the previous policy governing the evaluation of subjective symptoms. Id. at *1. SSR 16–3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." Id. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id. Thus, the adjudicator "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." Id. at *10. The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." Id. at *2. The ALJ's February 10, 2014 decision was issued before March 28, 2016, when SSR 16–3p became effective, and there is no binding precedent interpreting this new ruling including whether it applies retroactively. Compare Ashlock v. Colvin, 2016 WL 3438490, at *5 n.1 (W.D. Wash. June 22, 2016) (declining to apply SSR 16–3p to an ALJ decision issued prior to the effective date), with Lockwood v. Colvin, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016) (applying SSR 16–3p retroactively to a 2013 ALJ decision); see also Smolen, 80 F.3d at 1281 n.1 ("We need not decide the issue of retroactivity [as to revised regulations] because the new regulations are consistent with the Commissioner's prior policies and with prior Ninth Circuit case law") (citing Pope v. Shalala, 998 F.2d 473, 483 (7th Cir. 1993) (because regulations were intended to incorporate prior Social Security Administration policy, they should be applied retroactively)). Further, SSR 16–3p on its face states that it is intended only to "clarify" the existing regulations. Nevertheless, because the ALJ's findings are insufficient under either standard, the Court need not resolve the retroactivity issue. Notwithstanding the foregoing, SSR 16–3p shall apply on remand.

overlooks Plaintiff's descriptions of pain in his hands, neck, and knees - all of which were documented and supported throughout Plaintiff's medical history.  See id. at 39-43; Ghanim, 763 F.3d at 1164.

Additionally, the ALJ noted Plaintiff "received unemployment compensation during the relevant period at issue," which would have required Plaintiff "to certify he was willing and able to engage in work activity."  AR at 24. The ALJ reasoned this fact impacted Plaintiff's "credibility and weight of the evidence as a whole."  Id.  However, while receipt of unemployment benefits *can* be a legally sufficient reason to find a plaintiff not credible under certain circumstances, receipt of benefits does not *necessarily* constitute a legally sufficient reason for an adverse credibility determination.  See Mulanax v. Commissioner of Social Sec., 293 Fed. Appx. 522, 523 (9th Cir. 2008) (holding receipt of unemployment benefits that were payable to applicants available for *temporary or part-time jobs* was not necessarily inconsistent with a claim of disability under the Social Security Act); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) (finding that receipt of unemployment benefits can undermine a plaintiff's alleged inability to work *full-time*, but a court's reliance on receipt of benefits alone without determining whether plaintiff held himself out as available for full-time or part-time work is erroneous).

Here, while the record establishes Plaintiff received unemployment benefits, the ALJ failed to determine whether Plaintiff held himself out as available for full-time or part-time work during the time he received these benefits.  See id. at 42; Lind v. Colvin, No. EDCV 14-1474 RNB, 2015 WL 1863313, at *3 (C.D. Cal. Apr. 23, 2015) (noting a person may receive both unemployment benefits and social security benefits if he is capable of only *part-time* work).  In fact, during the hearing, the ALJ simply asked Plaintiff whether he was "trying to find a job at [the time he received unemployment benefits];" to which Plaintiff responded that he was not. Id.  Thus, without determining whether Plaintiff held himself out as available for

full-time or part-time work, the fact that Plaintiff received unemployment compensation during the relevant period at issue is not a specific, clear, and convincing reason to reject Plaintiff's testimony. See Brown-Hunter, 806 F.3d at 489.

Lastly, the ALJ inexplicably cites Plaintiff's criminal history in his credibility discussion. See AR at 23. To the extent Plaintiff's "history of imprisonment in 1991, 1992, and 2005 for sale of a controlled substance" was a factor affecting the ALJ's credibility determination, such evidence is not relevant because the convictions do not involve crimes of dishonesty. Fair, 885 F.2d at 603; Nicklas v. Halter, No. C 00-1904 CRB, 2001 WL 492461, at *5 (N.D. Cal. Apr. 25, 2001).

Thus, the ALJ's reasons for finding Plaintiff not credible are insufficient to reject Plaintiff's testimony regarding the intensity, persistence, and functionally limiting effects of his medical symptoms.

## VIII.

## RELIEF

### A.    APPLICABLE LAW

"When an ALJ's denial of benefits is not supported by the record, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Hill, 698 F.3d at 1162 (citation omitted). "We may exercise our discretion and direct an award of benefits where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." Id. (citation omitted). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." Id. (citations omitted); see also Reddick, 157 F.3d at 729 ("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.").

**B.    ANALYSIS**

In this case, the record has not been fully developed.  The ALJ must reassess Plaintiff's credibility and allegations of pain in light of the overall diagnostic record. Accordingly, remand for further proceedings is appropriate.

## IX.

## <u>CONCLUSION</u>

For the foregoing reasons, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this action for further proceedings consistent with this Order.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

Dated: July 06, 2017

_____
HONORABLE KENLY KIYA KATO
United States Magistrate Judge